IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                              CRIMINAL NO. 3:16CR00071-DPJ-LRA-4

VINCENT TAYLOR MCGEE




**TRANSCRIPT OF DETENTION HEARING**

BEFORE THE HONORABLE LINDA R. ANDERSON
UNITED STATES MAGISTRATE JUDGE

OCTOBER 20, 2016
JACKSON, MISSISSIPPI

APPEARANCES:

FOR THE GOVERNMENT:
  CHRISTOPHER L. WANSLEY, ESQUIRE
  OFFICE OF THE UNITED STATES ATTORNEY
  501 EAST COURT STREET, SUITE 4.430
  JACKSON, MISSISSIPPI  39201

FOR THE DEFENDANT:
  DREW MCLEMORE MARTIN, ESQUIRE
  MCRAE LAW FIRM, PLLC
  416 EAST AMITE STREET
  JACKSON, MISSISSIPPI  39201

PROBATION OFFICER:  BROOKE SULLIVAN


**DIGITALLY RECORDED**

TRANSCRIBED BY:  TERI B. NORTON, RMR, FCRR, RDR
                 2012 15TH STREET, SUITE 403
                 GULFPORT, MISSISSIPPI  39501
                 (228)563-1748

1          **THE COURT:**  Good afternoon to each of you.

2          **MR. WANSLEY:**  Good afternoon, Your Honor.

3          **THE COURT:**  We have one matter before the Court.

4    Would you call the case for the government, please.

5          **MR. WANSLEY:**  Yes, Your Honor.  Present before the

6    Court we have United States versus Vincent Taylor McGee,

7    Criminal Number 3:16cr71, and we are here, Your Honor, for a

8    detention hearing, and Mr. McGee is present in court with his

9    honorable counsel Drew Martin.

10         **THE COURT:**  Okay.  Thank you.  This matter has been

11   set for a detention hearing.  Are you ready to go forward?

12         **MR. WANSLEY:**  Yes, Your Honor.  The government is, if

13   the Court is ready, ready to call our first witness.

14         **THE COURT:**  Mr. McGee, are you ready to go forward?

15         **MR. MARTIN:**  We are, Your Honor.

16         **THE COURT:**  All right.  Let me start by saying that

17   this is a presumption case.  He has been charged in two counts

18   of a multi-count indictment.  Both of the charges qualify as

19   presumption cases, which means that normally, Mr. McGee, many,

20   if not most other offenses, the law gives them the presumption

21   that there are some conditions or combinations of conditions

22   that the Court can impose and release that person and be

23   assured that they will not be a flight risk or a danger to the

24   community.  There are also another set of violations, where if

25   you are charged with it, what's called presumption cases, the

1    presumption works just the opposite.  It is presumed, if you

2    are charged with these certain offenses, that no condition or

3    combination of conditions will assure the Court that you're not

4    a flight risk or a danger.  Those presumptions are rebuttable.

5    You can offer evidence to try to get over that, but you have a

6    much higher hill to climb when you commit one of these offenses

7    such as this, a drug trafficking offense.  It also applies to

8    gun offenses.  And this is involving firearms.  But at any

9    rate, the burden is on you to show the Court that you are not a

10    flight risk or a danger to the community.

11         With that said, I'm ready to hear whatever testimony you

12    have.

13         **MR. WANSLEY:**  Yes, Your Honor.  At this time, the

14    government calls Jeremiah Rayner.

15         **THE COURT:**  Raise your right hand and put your left

16    hand on the Bible.

17                       **JEREMIAH RAYNER,**

18    **having first been duly sworn, testified as follows:**

19         **THE COURT:**  You may be seated.  And if you will state

20    and spell your full name.

21         **THE WITNESS:**  Jeremiah Rayner, J-E-R-E-M-I-A-H

22    R-A-Y-N-E-R.

23         **THE COURT:**  Thank you.  You may proceed.

24         **MR. WANSLEY:**  Yes, Your Honor.

25                       **DIRECT EXAMINATION**

1    **BY MR. WANSLEY:**

2    Q.  Mr. Rayner, where are you employed?

3    A.  I'm a special agent with the Drug Enforcement

4    Administration.

5    Q.  And how long have you been employed with DEA?

6    A.  Approximately six years.

7    Q.  And in your capacity as a special agent with DEA, do you,

8    I guess, investigate drug crimes?

9    A.  Yes.

10   Q.  And as part of your investigation, did you have the

11   occasion to investigate the conduct of a Vincent McGee?

12   A.  Yes.

13   Q.  Please inform the Court what you learned in your

14   investigation.

15   A.  Mr. McGee was initially intercepted in a wire tap

16   investigation on Allen Sims.  Sims requested that McGee

17   transport approximately a kilogram of methamphetamine from

18   Atlanta to Sims in Mississippi.

19        **THE COURT:**  I'm sorry.  Would you repeat that?

20        **THE WITNESS:**  Yes, ma'am.  Allen Sims requested --

21   with intercepts indicated Allen Sims was requesting Vincent

22   McGee to transport one kilogram of methamphetamine from

23   Atlanta, Georgia to Jackson, Mississippi.

24        **THE COURT:**  Thank you.

25   A.  During the intercepts, they discussed McGee transporting

1    it.  Mr. McGee picked it up in Atlanta from some individuals

2    that were associated with the Mexican source of supply that

3    Sims was dealing with.  And Sims also -- excuse me.  When McGee

4    picked up the methamphetamine, it was a different color than

5    they anticipated.  They were concerned about the color, but --

6    meaning lesser purity.  So a message was relayed.  Mr. McGee

7    indicated he would send a photo of it to Mr. Sims, and we were

8    actually able to intercept a photo of Mr. Sims sending it out

9    to the Mexican source of supply.

10       We conducted a ping on Mr. McGee's phone attempting to

11   intercept it as it came back.  Unfortunately, the ping

12   intercepts were intermittent, and we were not able to intercept

13   it.  And in February of 2016 --

14   Q.  First let's make sure we get to understand the time

15   period.  What you just testified to I guess occurred in

16   November of 2015?

17   A.  November of 2016.  That's correct.

18   Q.  '16 or '15?

19   A.  '15.  I'm sorry.

20   Q.  And now you mentioned February?

21   A.  Yes, February of 2016.

22   Q.  What did you learn regarding any events that occurred in

23   February of 2016?

24   A.  The DEA Atlanta division were conducting an investigation

25   on a robbery crew who would rob drug dealers and take their

1   money and drugs.  They actually were able to stop it from

2   occurring to Mr. McGee and his family.  They intended to --

3   when Mr. McGee was bragging about his drug dealing to an

4   individual who relayed it to this drug robbery crew, they

5   intended to go over and kidnap his family and him and obtain

6   the drugs and money.  DEA agents were able to go to his house

7   and notify Mr. McGee and Ms. McGee.  They gave consent to

8   search their house.  There was found a lot of marijuana and two

9   handguns that were located in the house.  The two handguns were

10  in male shoes in a closet, and I think Ms. McGee advised that

11  they were hers, and Mr. McGee advised that they were his

12  wife's.

13          **THE COURT:**  The guns?

14          **THE WITNESS:**  The guns, yes.  There were also, I

15  believe, four juvenile children in the house as well.

16  **BY MR. WANSLEY:**

17  Q.  But you said the guns were found inside of I guess shoes

18  belonging to a man?

19  A.  That's correct.

20  Q.  And is there any other I guess more recent conduct that

21  you learned through your investigation?

22  A.  Yes, the most recent one --

23          **THE COURT:**  I'm sorry.  Before you leave that, I want

24  to make sure I understand that he was the target of a --

25          **THE WITNESS:**  He was the target of a drug robbery

1    crew robbery.

2                **THE COURT:**  And you said you were able to prevent it?

3                **THE WITNESS:**  Yes, ma'am.  The agents in Atlanta were

4    able to prevent the robbery from occurring.

5                **THE COURT:**  All right.  I'm sorry.  Go ahead.

6    **BY MR. WANSLEY:**

7    Q.  So is there any, I guess, more recent conduct that you've

8    learned that relates to Mr. McGee?

9    A.  Mr. McGee recently spoke with agents from the Jackson

10   Police Department.  They attempted to conduct a traffic stop on

11   Ms. McGee, and Mr. McGee was the passenger.  I think they

12   initially pulled over, and then Mr. McGee had thrown some

13   things out of the window, or maybe opened the door and set them

14   on the ground.  It was PCP and some pills as well.  And then he

15   fled the scene and proceeded to be in a pursuit with police.

16   Mr. McGee threw a pistol out of the passenger side of the

17   vehicle that they were able to recover.  And then Mr. McGee

18   eventually fled the vehicle on foot, and they were able to stop

19   Ms. McGee, and they subsequently found marijuana and cocaine in

20   the vehicle.

21   Q.  I just want to make sure that we understand you correctly.

22   It's your understanding that I guess law enforcement saw drugs

23   and a gun thrown from the passenger side of the vehicle?

24   A.  Yes.

25   Q.  And they were able to identify Mr. McGee as the person

1    being in the passenger side of that vehicle?

2    A.   Yes.  He fled on foot and was subsequently apprehended a

3    short time after hiding in the woods near a wood line.

4            **MR. WANSLEY:**  Your Honor, I tender this witness for

5    cross-examination.

6            **THE COURT:**  Cross-examination.

7            **MR. MARTIN:**  One moment.

8                         **CROSS-EXAMINATION**

9            **MR. MARTIN:**  Your Honor, do I need the microphone?

10   Is this one working as a microphone?

11           **THE COURT:**  That should be working.

12           **MR. MARTIN:**  Okay.  I couldn't tell for sure.  Thank

13   you.

14   **BY MR. MARTIN:**

15   Q.   Agent Rayner --

16   A.   Yes, sir.

17   Q.   -- hello.  I'm Drew Martin.  I represent Mr. McGee.  Let

18   me ask you first, the last instance you discussed related to

19   the JPD traffic stop, when did that occur?

20   A.   I'm not sure.  It was -- we conducted the rest of the

21   round-up on this the 19th of September.  It was approximately a

22   week or two prior to that.

23   Q.   Early to mid-September?

24   A.   Yes, sir.

25   Q.   That's good enough.  You understand that we are here for a

1    detention hearing for Mr. McGee, correct?

2    A.  Yes, sir.

3    Q.  And that even though it's not your decision, obviously, to

4    make, the Court will consider the danger to the community as

5    one of the issues of Mr. McGee?

6    A.  Yes.

7    Q.  Were you involved in this investigation as of November of

8    2015, when these wire tap intercepts that you've described

9    occurred?

10    A.  Yes.

11    Q.  What was your role in the investigation at that time?

12    A.  I'm the case agent.

13    Q.  Were you involved in procuring the warrants for the taps?

14    A.  Yes.

15    Q.  Were you involved in any way in the actual review or

16    listening in to the surveillance?

17    A.  Yes.

18    Q.  Did you consider that -- I think what you described in

19    general, and correct me if I'm mischaracterizing this, but it

20    was listening to a drug transaction in which Mr. McGee would

21    have assisted Allen Sims and some other individuals with what

22    you described I think as approximately one kilogram of meth?

23    A.  That's correct.

24    Q.  Did you consider that any of the people involved in that

25    might be a danger to the community?

1   A.  Yes.

2   Q.  Were they even charged at that time?

3   A.  Not at that time, no.

4   Q.  Were any of them picked up?

5   A.  Not at that time.

6   Q.  Did they remain free?

7   A.  Until recently, when they were arrested, yes.

8   Q.  I think you said September 19th?  Is that what you said?

9   A.  That's correct.

10  Q.  So that's, what, ten months approximately?

11  A.  Approximately.

12  Q.  Later you said in February of 2016, there was some

13  situation.  I don't think you described -- let me back up.  In

14  February of 2016, you described the situation in which Mr.

15  McGee and his family were allegedly targets of a robbery crew

16  that was robbing drug dealers; is that correct?

17  A.  That's correct.

18  Q.  And that Atlanta agents, I think you said, intervened?

19  A.  Yes.

20  Q.  At the time that whatever agents, when they went to the

21  McGee home, was Mr. McGee under investigation for any crime at

22  that time in February of 2016?

23  A.  By our office, yes.

24  Q.  Let me rephrase that.  Did the agents go to his home

25  because they suspected him of wrongdoing, or did they go to his

1   home to intervene in this situation in which he and his family

2   were going to be victims of a crime?

3   A.   Given that it was a drug robbery crew, I'm sure they made

4   that presumption that he was a drug dealer.  However, they were

5   there to intercept and prevent the violence from occurring --

6   Q.   What's the --

7   A.   To Mr. McGee.

8   Q.   I'm sorry to interrupt you.  I understand.  And what was

9   the evidence they had that he would have been a drug dealer at

10  that time, other than the November 2015 incident that you

11  mentioned?

12  A.   They had information that he was bragging about drug

13  dealing to an individual who then provided that information to

14  the drug robbery crew.

15  Q.   Was that information also obtained as part of the wire tap

16  surveillance?

17  A.   It's not on there.

18  Q.   In any event, they didn't go to serve a warrant on Mr.

19  McGee and his family, correct?

20  A.   No, they did not.

21  Q.   When you say Mr. and Mrs. McGee gave consent to search the

22  home, is Mr. McGee this Mr. McGee?

23  A.   To the best of my knowledge.

24  Q.   And Mrs. McGee was his wife or mother?

25  A.   Victoria McGee.

1    Q.  Okay.  Did you obtain written consent?

2    A.  I didn't obtain it.  The agents at the scene did have

3    handwritten consent, yes.

4    Q.  But your understanding is, whoever was there, I didn't

5    mean to imply it was you, the agents obtained written consent?

6    A.  Yes, that's correct.

7    Q.  And is that somewhere in the case file that we will see

8    eventually?

9    A.  Yes, it is in that case file.

10    Q.  At any time, did Mr. McGee or his wife or anyone else

11    withdraw that consent or ask you to leave?

12    A.  Not that I'm aware of.

13    Q.  And again, I say you generally.  I mean the agents.  Did

14    they ask why you were there?

15    A.  I think the agents, when they knocked on the door, advised

16    them of what was occurring.

17    Q.  At that time, based on what you say was marijuana and guns

18    that were found in the home, was Mr. McGee or Mrs. McGee, were

19    either of them charged in the crime?

20    A.  No.

21    Q.  Were either of them detained?

22    A.  No.

23    Q.  That was in February of 2016?

24    A.  That's correct.

25    Q.  And as we sit here today, it's October 20th of 2016?

1    A.   That's correct.

2    Q.   The traffic stop by JPD that occurred somewhere around

3    September of this year, were you involved, or was your office

4    involved at all in that traffic stop?

5    A.   No.

6    Q.   When you say JPD, I assume you mean Jackson Police?

7    A.   Yes.

8    Q.   How did you say Mr. McGee was eventually -- I missed the

9    end of it.  I apologize.  But how did you say Mr. McGee was

10   eventually found in that situation?

11   A.   Mr. McGee had fled from the car on foot and jumped off of

12   like a bridge on the interstate, on an overpass, and to my

13   knowledge, they apprehended him in a wood line hiding maybe

14   approximately an hour or two afterwards.

15   Q.   Did he or Mrs. McGee admit any knowledge of this PCP or

16   gun that were found on the side of the road that purportedly

17   were discarded from the vehicle?

18   A.   I don't know.

19   Q.   Were either he or Mrs. McGee charged with possession of

20   PCP or felon in possession or any other gun charge?

21   A.   I'm not aware of what the charges were.

22   Q.   Are you aware if there were any charges?

23   A.   There were charges.  I'm not aware of what the specific

24   charges were.

25   Q.   Would it surprise you if the only charge was possession of

1    marijuana?

2    A.  I don't know.

3    Q.  Is it possible that that was the only charge that was

4    actually -- out of this reported situation, is it possible that

5    was the only charge?

6    A.  It would be up to the officers on what they deemed to

7    charge him with.

8    Q.  You just don't have any information one way or the other

9    about that?

10    A.  Yes.

11    Q.  So just to summarize then, your testimony is that in

12    November of 2015, Mr. McGee was picked up by surveillance on

13    some sort of large-scale meth deal, that in February of 2016,

14    he was a potential victim of crime, and during the course of

15    investigating that, guns and drugs and marijuana was

16    purportedly found, and that in earlier September, there was a

17    traffic stop that he purportedly had guns and drugs -- have I

18    summarized that fairly?

19    A.  Yes.

20    Q.  And during any -- all of that time over the last year,

21    until September 19th of this year, Mr. McGee hasn't been

22    detained or charged with any crime related to any of those

23    instances?

24    A.  No, that's why he is currently in custody, is for the last

25    charge.  I believe he was also arrested in July, somewhere

1    around there, where he went through a checkpoint, and they

2    found marijuana and a gun in his vehicle, and that

3    (inaudible) --

4    Q.   Do you know who arrested him at that point?

5    A.   I believe that was Jackson Police Department.

6    Q.   Do you know if he was detained at that point?

7    A.   I think he was, but I'm not sure.

8    Q.   During any of these events and including the wire tap

9    evidence that's been obtained by the government, has Mr. McGee

10   physically threatened anyone that you're aware of?

11   A.   Not that I'm aware of.

12   Q.   Has he committed any act of violence that you're aware of?

13   A.   During the investigation?

14   Q.   During this time period you've been testifying about.

15   A.   No.  There's an extensive criminal history of violence,

16   but nothing that I was aware of.

17   Q.   Actually, I'm looking at the probation report, and I'm

18   sure the prosecutor will submit it to the Court, and it does,

19   we can see, have a fairly lengthy criminal history as part of

20   it.

21        Agent Rayner, thank you.  No further questions.

22   A.   Yes, sir.

23            **THE COURT:**  Any redirect?

24            **MR. WANSLEY:**  No redirect, Your Honor.

25            **THE COURT:**  You may step down.

1      **THE WITNESS:**  Thank you, Your Honor.

2      **THE COURT:**  What would the government have?

3      **MR. WANSLEY:**  Yes, ma'am.  We would like to call Ms.

4 Sullivan to the stand.

5      **THE COURT:**  Place your left hand on the Bible and

6 raise your right hand.

7                          **BROOKE SULLIVAN,**

8 **having first been duly sworn, testified as follows:**

9      **THE COURT:**  Thank you.  You may be seated.

10      **MR. WANSLEY:**  May I proceed?

11      **THE COURT:**  You may.

12 **BY MR. WANSLEY:**

13 Q.  Ms. Sullivan, where are you employed?

14 A.  U. S. Probation.

15 Q.  I didn't even ask.  What is your full name?

16 A.  Brooke Sullivan.

17 Q.  And where are you employed?

18 A.  U. S. Probation.

19 Q.  And have you had the opportunity to look into the criminal

20 history of Mr. McGee?

21 A.  I have.

22 Q.  And you included that information in a pretrial services

23 report, correct?

24 A.  Correct.

25 Q.  Is there any information that you recently learned that

1    does not appear in that report?

2    A.   There is -- an additional report was given today when I

3    got in court on a September 3rd, 2010, Lauderdale County

4    Sheriff's Department arrest.  The defendant was sentenced on

5    September 22, 2011 to 5 years in custody, four suspended, one

6    to serve, with five years of post-release supervision to run

7    consecutive to his other charges.  Therefore, that probation

8    has not begun yet, as he has not completed the other terms of

9    probation or post-release supervision.

10         And I also received an e-mail after I got into court here

11   today from a Hinds County, Mississippi Department of

12   Corrections supervisor stating that they will be filing a

13   revocation on the defendant for these current charges, and that

14   that that will be completed as soon as possible.

15   Q.   So is it your understanding that in 2016 and 2015, that

16   this defendant was on some form of supervised release?

17   A.   Yes.

18         **MR. WANSLEY:**  No further questions for this witness,

19   Your Honor.

20         **THE COURT:**  Cross-examination.

21         **MR. MARTIN:**  No questions, Your Honor.

22         **THE COURT:**  All right.  Is he still on probation?

23         **THE WITNESS:**  Yes, ma'am.

24         **THE COURT:**  And he was in '14 and '15, when this

25   alleged offense occurred?

 1          **THE WITNESS:**  Yes, ma'am.  I believe he has been on

 2    probation since May of 2014.

 3          **THE COURT:**  Thank you.  Any questions in light of my

 4    questions?

 5          **MR. WANSLEY:**  No further questions from the

 6    government, Your Honor.

 7          **THE COURT:**  Do you have any questions in light of

 8    mine, Mr. Martin?

 9          **MR. MARTIN:**  No, Your Honor.

10          **THE COURT:**  All right.  Thank you.  You may step

11    down.  What would the government have?

12          **MR. WANSLEY:**  The government has no further

13    witnesses, Your Honor.  And we would like to offer the pretrial

14    services report, of course, under seal.

15          **THE COURT:**  Any objection?

16          **MR. MARTIN:**  No objection.

17          **THE COURT:**  All right.  It will be admitted.

18        **(EXHIBIT G-1 MARKED)**

19          **THE COURT:**  The government has rested.  What would

20    the defendant have?

21          **MR. MARTIN:**  I'm sorry, Your Honor?

22          **THE COURT:**  The government has rested.  What would

23    the defendant have at this time?

24          **MR. MARTIN:**  We have no further evidence.  I did want

25    to, by way of proffer, let the Court know that Mr. McGee's

1    family is here, including his father and mother and wife, that

2    they have all -- I have spoken to all of them prior to this

3    hearing, that if the Court were to find that some conditions

4    could be imposed that would be consistent with the statute,

5    that the McGees are prepared to assist with that, provide

6    supervision, that they have all mentioned that they would

7    welcome electronic monitoring and would be able to pay the cost

8    of that and assist with that, and that they would -- Mr.

9    McGee's home, where they live, that the younger Mr. McGee here,

10   of course, would be welcome to live there with them where the

11   there is a land line.  And that address I think has already

12   been provided to probation services as well.

13            **THE COURT:**  All right.  Thank you, sir.

14        **MR. MARTIN:**  Thank you, Your Honor.

15            **THE COURT:**  All right.  The defense has rested.  Any

16   rebuttal by the government?

17        **MR. WANSLEY:**  No, Your Honor.

18            **THE COURT:**  All right.  If counsel wishes to, I will

19   entertain brief argument from either side, or you can waive it.

20   I'll let you make the call.  What says the government?

21        **MR. WANSLEY:**  The government would I guess waive

22   argument but would just remind the Court that this is a

23   presumption case, and the government does ask the Court to

24   consider the pretrial services report and any testimony from

25   Agent Rayner, Your Honor, as well as Ms. Sullivan.

1          **THE COURT:** All right.  Thank you.

2          **MR. MARTIN:** Your Honor, I would like to point out

3     that while it is a presumption case, the burden on the

4     defendant at that point is to produce evidence from which the

5     Court could determine the presumption has been overcome.

6     Evidence has been presented here through testimony and through

7     the pretrial services report and through the proffer that a

8     home with electronic monitoring is available.

9          The defendant concedes a long criminal history, which the

10    Court is aware of.  Nevertheless, this investigation has been

11    going -- the investigation that leads Mr. McGee to be here

12    today has been ongoing for at least approximately a year that

13    we heard testimony about today, and the agents who are

14    responsible for the investigation apparently did not find Mr.

15    McGee enough of a danger to flee the community or endanger the

16    community to take any action to get him off the streets.

17    Instead, they thought it was more important to continue their

18    investigation, which they did.

19         I point that out only to say that that was -- that was

20    true even with no supervision by the Court and by probation.

21    Of course, the Court is in a position now to put in place

22    provisions and conditions that would be far more restrictive on

23    Mr. McGee.  And the only other thing I failed to mention, the

24    older Mr. McGee, if I can call him that, I apologize, Mr.

25    McGee's father, does run his own business.  He has had an

1    air-conditioning business for approximately 20 years, and he

2    has also informed me that if his son is allowed out under

3    restrictive conditions, that he will put him to work and that

4    he will be employed regularly during that time period to help

5    support himself and his family.

6         **THE COURT:**  All right.  Thank you.  The Court has

7    considered all of the evidence and testimony produced and has

8    considered a number of factors, the nature and circumstances of

9    the offense, the weight of the evidence, the history and

10   characteristics of the defendant, including family ties,

11   employment, that at the time of the arrest, he was on probation

12   and parole, and the nature and seriousness of the danger to any

13   person in the community that would be posed by him.

14        As I said at the beginning, this is a presumption case,

15   and he has the burden in this case.  The only thing that I

16   heard in his favor is that he has his family who supports him,

17   who stands by him and gave him an opportunity to get into and

18   go to college, and he chose to go a different route,

19   apparently.

20        As far as starting even at the baseline, everything that

21   I've heard here negates anything that I've heard that would

22   encourage the Court to release him at this time.  I would note

23   that the defendant apparently had an employment opportunity

24   with his father, and it was advised that he has been unemployed

25   since July of 2016, for whatever reason.

1           The Court notes counsel's argument that he has been free

2   during this time.  That does not provide a basis for the Court

3   that he has met all the factors before me at this time.  This

4   defendant has an extensive criminal history.  He has a history

5   of violent offenses.  I note a 2006 conviction for armed

6   robbery, a 2006 conviction for armed carjacking and armed

7   robbery, a 2009 conviction for conspiracy to introduce

8   contraband into a prison, a September 2011 conviction for

9   possession of contraband, a weapon in a prison.  There are even

10  more recent charges with no disposition.  That the defendant

11  was on some kind of supervision at the time of the alleged

12  offense involved in this case, and that the defendant put not

13  only himself at risk but his family at risk, according to the

14  credible evidence before the Court, that could have resulted in

15  some serious harm to him and to his family as well.

16          The Court finds, based on all of these, be it by clear and

17  convincing evidence, that there has been absolutely no evidence

18  to show that any conditions or combination of conditions will

19  assure the Court of his appearance or that he is not a flight

20  risk.

21          The Court will also note that this defendant fled,

22  according to the testimony, from probation -- I'm sorry, from

23  law enforcement and engaged in a chase with those law

24  enforcement officers fairly recently.  That along with the

25  possession of firearms and other drugs and all of the other

1    testimony, again, forms the basis for the Court's finding that

2    this defendant should be detained until further notice of the

3    Court.  Is there anything from the government?

4              **MR. WANSLEY:**  No, Your Honor.

5              **THE COURT:**  Anything further from the defense?

6              **MR. MARTIN:**  Nothing further, Your Honor.

7              **THE COURT:**  All right.  Then Mr. McGee, you will be

8    remanded to the custody of the Marshals to await further

9    hearing in this matter.  There being nothing else, we stand

10   adjourned.

11                         (HEARING CONCLUDED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF COURT REPORTER

4

5        I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6   Reporter for the United States District Court for the Southern

7   District of Mississippi, appointed pursuant to the provisions

8   of Title 28, United States Code, Section 753, do hereby certify

9   that the foregoing is a correct transcript of the proceedings

10  audio recorded and transcribed by me using the audio recording

11  made in this matter, and that same is a true and correct

12  transcript to the best of my ability and understanding.

13  Any inaudibles that occur in the transcript are a result of the

14  poor recording quality of the audio.

15       I further certify that the transcript fees and format

16  comply with those prescribed by the Court and the Judicial

17  Conference of the United States.

18

19

20

21       s/ *Teri B. Norton*
         TERI B. NORTON, RMR, FCRR, RDR
22       OFFICIAL COURT REPORTER

23

24

25